## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

ABIGAIL ESQUIBEL, TAMMY SEARLE, JEREMY WAHL, AIMEN HALIM and NICHOLAS SALERNO, individually and on behalf of all others similarly situated,

Plaintiffs,

v.

COLGATE-PALMOLIVE CO., and TOM'S OF MAINE, INC.,

Defendants.

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

Abigail Esquibel, Tammy Searle, Jeremy Wahl, Aimen Halim, and Nicholas Salerno ("Plaintiffs") bring this Class Action Complaint against Defendant Colgate-Palmolive Co. and Tom's of Maine, Inc. ("Defendants"), individually and on behalf of all others similarly situated, and allege as follows upon personal knowledge as to themselves and their own acts and experiences and, as to all other matters, upon information and belief based upon, inter alia, the investigation conducted by their attorneys.

### NATURE OF THE ACTION

1.      Plaintiffs bring this important consumer class action lawsuit on behalf of similarly situated consumers ("Class Members") who purchased for personal, family, or household use, Tom's Wicked Fresh! Mouthwash (the "Product"[1]), which is prominently labeled as a "natural" mouth wash. In reality, Plaintiffs' testing has revealed that the Product contains per- and

---

[1] As alleged herein, Defendants conceal the presence of PFAS in the Product. Accordingly, discovery will reveal the exhaustive list of substantially similar products that are included in this action.

polyfluoralkyl substances ("PFAS"), a category of synthetic chemicals that are, by definition, not natural.

2.      PFAS are a group of synthetic, man-made, chemicals known to be harmful to both humans and the environment.  Because PFAS persist and accumulate over time, they are harmful even at very low levels.  Indeed, "PFAS have been shown to have a number of toxicological effects in laboratory studies and have been associated with thyroid disorders, immunotoxicity effects, and various cancers in epidemiology studies."[2]

3.      In fact, scientists are studying—and are extremely concerned about—how PFAS affect human health.  Consequently, the CDC outlined "a host of health effects associated with PFAS exposure, including cancer, liver damage, decreased fertility, and increased risk of asthma and thyroid disease."[3]

4.      Defendants formulate, manufacture, market, and sell the Product, which they uniformly represent as a "natural" mouth wash that is made by the "#1 Natural Mouthwash Brand".

---

[2] Nicholas J. Heckert, et al. "Characterization of Per- and Polyfluorinated Alkyl Substances Present in Commercial Anti-fog Products and Their In Vitro Adipogenic Activity," Environ. Sci. Technol. 2022, 56, 1162-1173, 1162.

[3] Harvard T.H. Chan Sch. Of Pub. Health, Health Risks of widely used chemicals may be underestimated (June 27, 2018), https://www.hsph.harvard.edu/news/hsph-in-the-news/pfas-healthrisks-underestimated/ (last visited Aug. 15, 2022).



5.   Defendants have engaged in tireless marketing efforts to convince consumers that its mouthwashes, including the Product at issue, are made with natural ingredients.

6.   Defendants, as one of the leading manufacturers of natural hygiene products, know

the importance of marketing and labeling, including the value of the label representations they carefully choose for placement on the Product, including the "natural" representation on the front of the Product label.

7.      Defendants state their mission is to "make products that are good for you and good for the planet!"[4]

8.      Defendants' uniform marketing is intentionally designed to drive sales and increase profits by targeting health-conscious consumers who reasonably believe that the Product is natural and therefore free from synthetic or artificial ingredients which are known to be harmful to human health.

9.      However, despite Defendants' consistent and pervasive marketing representations to consumers that their Product is a healthy, all-natural mouthwash, Plaintiffs' independent testing has determined that the Product actually contains PFAS—a category of man-made chemicals with a toxic, persistent, and bioaccumulative nature which are associated with numerous health hazards.

10.     The presence of PFAS is entirely inconsistent with Defendants' uniform representations that the Product only contains only "natural" ingredients.

11.     As a result of Defendants' misconduct, Plaintiffs and putative Class Members have suffered injury in fact, including economic damages.

12.     Accordingly, Plaintiffs bring their claims against Defendants individually and on behalf of a Class of all others similarly situated for: (1) violation of the Magnuson-Moss Warranty Act 15 U.S.C. § 2301, *et seq.*; (2) violation of California's False Advertising Law, Business & Professions Code § 17500; (3) violation of California's Unfair Competition Law, Business & Professions Code § 17200 *et seq.*; (4) violation of California's Consumer Legal Remedies Act,

---

[4] https://www.tomsofmaine.com/our-promise/our-mission (last visited January 4, 2023).

Civil Code § 1770; (5) violation of the Illinois Consumer Fraud and Deceptive Business Practices Act 815 ILCS § 505/1 *et seq*.; (6) breach of express warranty; (7) fraud; (8) constructive fraud; and (9) unjust enrichment.

## PARTIES

### A. Plaintiffs

***Plaintiff Esquibel***

13.     Abigail Esquibel is a resident of Los Angeles California, and was, at all times relevant hereto, a citizen of California.

***Plaintiff Searle***

14.     Tammy Searle is a resident of Rancho Mirage, California, and was, at all times relevant hereto, a citizen of California.

***Plaintiff Wahl***

15.     Jeremy Wahl is a resident of Huntington Beach, California, and was, at all times relevant hereto, a citizen of California.

***Plaintiff Halim***

16.     Aimen Halim is a resident of Chicago, Illinois, and was, at all times relevant hereto, a citizen of Illinois.

***Plaintiff Salerno***

17.     Nicholas Salerno is a resident of Palos Park, Illinois, and was, at all times relevant hereto, a citizen of Illinois.

### B. Defendants

18.     Defendant Colgate Palmolive Co. is a Delaware corporation with its principal place of business at 300 Park Ave, New York, New York 10022.

19.     Defendant Tom's of Maine, Inc. is a Maine corporation whose principal place of business is located in Kennebunk, Maine at 2 Storer St Ste 302, Kennebunk, ME, 04043.

## JURISDCTION AND VENUE

20.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332 of the Class Action Fairness Act of 2005 because: (1) there are 100 or more proposed Class Members, (ii) the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest and costs, and (iii) there is minimal diversity because Plaintiffs and Defendants are citizens of different states.

21.     This Court has personal jurisdiction over Defendants because they transact business in this State and District, have substantial aggregate contacts with this State and District, engaged in conduct that has and had a direct, substantial, reasonably foreseeable, and intended effect of causing injury to persons in this State and District, and because they purposefully availed themselves of the laws of the State of New York.

22.     In accordance with 28 U.S.C. § 1391, venue is proper in this District because Defendant Colgate Palmolive Co. is headquartered in this District and does business throughout this District.

## FACTUAL ALLEGATIONS

### Defendants' Business

23.     Defendant Tom's of Maine ("Tom's") was founded in 1970 as a producer and seller of natural personal care products. Tom's has been a majority-owned subsidiary of Colgate Palmolive Co. ("Colgate") since 2006.

24.     Tom's manufactures 90 oral and body care products that are sold at more than 40,000 retail outlets worldwide.

25.     Tom's revenue is approximately $58.3 million annually. The United States Personal Care Market is estimated at $91.41 billion. Certain groups have projected the natural personal care market size to reach 3.17 billion for the United States by 2025.[5]

26.     In order to capitalize on increasing consumer demand for personal care products that are free from artificial or synthetic ingredients, Defendants aggressively market its products to health-focused consumers with the products' pervasive "natural" representations prominently displayed across the products' packaging.

27.     Defendants sell the Product that is the subject of this litigation at mass market pharmacies and retailers throughout the United States, including Target, Whole Foods, Amazon, CVS, RiteAid, and Walgreens.

***Defendants' False and Deceptive Advertising***

28.     The Product is a mouthwash which is uniformly represented as a "natural" mouthwash.

29.     The Product's packaging is replete with representations designed to convince consumers that it is a safe and healthy choice, beginning with the "natural" representation, which intentionally utilizes the word "natural" in order to reinforce its claims that the Product is free from artificial or unnatural ingredients.

---

[5] https://www.grandviewresearch.com/press-release/us-natural-personal-care-market-analysis#:~:text=U.S.%20Natural%20Personal%20Care%20Market%20Size%20Worth%20%243.17,a%20CAGR%20of%209.6%25%20during%20the%20forecast%20period. (last visited January 26, 2022).



30.     Tom's also advertises itself as the premier natural personal care manufacturer and

touts itself on the Product as being the "#1 Natural Mouthwash Brand":



6

---

6 https://www.amazon.com/Toms-Maine-Lasting-Wicked-

31.     The Product does not disclose the presence of PFAS—or any other synthetic chemical—in their ingredients. Rather, Defendants claim the only ingredients are Water, Glycerin, Sorbitol, Aloe Barbadensis Leaf Juice, Propanediol, Xylitol, Natural Flavor, Benzoic Acid, Zinc Citrate, Menthol, Sodium Hydroxide (organic).[7] A picture of the below product label shows the purported ingredients within the Product:



32.     Beyond the Product's labeling, Defendants' other marketing efforts include its website where it goes to great lengths to talk about how the Product is "good for you and good for

---

Mountain/dp/B01N5WESTU/ref=asc_df_B01N5WESTU?tag=bingshoppinga-20&linkCode=df0&hvadid=80264400674213&hvnetw=o&hvqmt=e&hvbmt=be&hvdev=c&hvlocint=&hvlocphy=&hvtargid=pla-4583863982684315&th=1 (last visited January 26, 2023).

[7] https://www.amazon.com/Toms-Maine-Lasting-Wicked-Mountain/dp/B01N5WESTU/ref=sr_1_2_sspa?crid=3BTP95MFWBF1&keywords=tom%27s%2Bof%2Bmaine%2Bwicked%2Bfresh&qid=1672852044&s=beauty&sprefix=tom%27s%2Bof%2Bmaine%2Bwicked%2Bfresh%2Cbeauty%2C113&sr=1-2-spons&spLa=ZW5jcnlwdGVkUXVhbGlmaWVyPUEyT1FJMDQyMlNUVkxWJmVuY3J5cHRlZElkPUEwNzA3NjA2MjFJMUVaRkNFSVZHNiZlbmNyeXB0ZWRBZElkPUEwMjM5OTc5M1U2TVdUSlVZVjc5TSZ3aWRnZXROYW1lPXNwX2F0ZiZhY3Rpb249Y2xpY2tSZWRpcmVjdCZkZXb05vdExvZ0NsaWNrPXRydWU&th=1 (last visited January 4, 2023).

the planet!'""

> We are on a mission, the same mission since day one our company was founded with - to make products that are good for you and good for the planet! Our commitment to the planet, people, and health all intersect with our mission to create a healthy future for all people. And it shows up in everything we do - being a Certified B Corp, measuring our impact and setting sustainability goals, creating an inclusive environment for our employees, engaging with our communities and perfecting our ingredients. We are real people who care, working to make positive change by doing good. We call this "doing good, for real" and you'll see our focus in our products, our policies, and our partnerships.

33.    Defendants also post a "Stewardship Model" on their website where they reiterate their products are "natural", "safe", and "effective":[8]

## OUR STEWARDSHIP MODEL

A naturally healthy life doesn't just happen. It comes from making thoughtful decisions on what to do—and what not to do. That's how we approach our ingredient selection when creating safe and effective products for you. We work very hard to find and combine the best naturally sourced and naturally derived ingredients, guided by a process we call our Stewardship Model.

Every ingredient we use goes through our Stewardship review process, which directs our standards for creating natural, safe, and effective products. Packaging choices are also guided by the Stewardship Model as we are always striving to improve sustainability.

As part of our commitment to continuous improvement we have updated our Stewardship Model to make it easier to understand.  Rest assured that the underlying standards and process have not changed, but we wanted language that more directly spoke to the two areas the Stewardship Model guides: Formula and Packaging.  As always, we carefully consider your feedback! We welcome your input on how we can do more good for you, your community and our planet. Let us know what you think of the updated language!

---

[8] https://www.tomsofmaine.com/our-promise/stewardship-model (last visited January 5, 2023).

34.     It is undeniable that the Product is uniformly represented across all marketing channels–including the Product's packaging, where it cannot be missed by consumers–as a natural mouthwash.  As an intended result of this marketing, reasonable consumers reasonably believe that the mouthwash is free from artificial or synthetic chemicals.  More simply stated, a reasonable consumer expects the natural products that they buy to be whole, real, and minimally processed.

### *PFAS Chemicals and Associated Risks*

35.     PFAS are a category of highly persistent and potentially harmful <u>man-made chemicals</u>.[9]

36.     PFAS are <u>not naturally occurring</u>.[10] They were first developed by scientists in the 1940s.[11] Thus, they are indisputably "artificial" and not "natural."

37.     The man-made PFAS chemicals, which are in the Product, are sometimes called "forever chemicals" because they bioaccumulate, or build up in the body over time.

38.     PFAS is dangerous for the environment. The CDC has said that PFAS is dangerous because they "do not break down in the environment", "move through soils and contaminate drinking water sources, " and build up (bioaccumulate) in fish and wildlife".[12]

39.     Ingredients within mouthwash, such as alcohol, menthol, fluoride, and eucalyptol are exposed to consumers of mouthwash without ingesting the mouthwash.[13] This is because the

---

[9] *PFAS Explained*, EPA, https://www.epa.gov/pfas/pfas-explained (last visited October 24, 2022).

[10] https://www.atsdr.cdc.gov/pfas/resources/pfas-faqs.html (Last accessed October 24, 2022)

[11] https://www.3m.com/3M/en_US/pfas-stewardship-us/pfas-history/ (Last accessed October 24, 2022).

[12] https://www.cdc.gov/biomonitoring/PFAS_FactSheet.html#:~:text=Many%20PFAS%2C%20including%20perfluorooctane%20sulfonic%20acid%20%28PFOS%29%20and,3%20build%20up%20%28bioaccumulate%29%20in%20fish%20and%20wildlife. (last visited January 26, 2023).

[13] https://www.healthline.com/health/how-to-use-mouthwash#how-it-works (last visited January 26, 2023).

ingredients get into the crevices of your teeth and kill bacteria that can collect there while a consumer is using the product.[14]

40.　　These ingredients coat your teeth and absorb into your tooth enamel, helping to make your teeth more durable and plaque-resistant.[15]

41.　　PFAS chemicals have been associated with a variety of negative health effects for humans and the environment.

42.　　The EPA has identified that "[c]urrent peer-reviewed scientific studies have shown that exposure to certain levels of PFAS may lead to:"[16]

   a.  Reproductive effects such as decreased fertility or increased high blood pressure in pregnant women.
   b.  Developmental effects or delays in children, including low birth weight, accelerated puberty, bone variations, or behavioral changes.
   c.  Increased risk of some cancers, including prostate, kidney, and testicular cancers.
   d.  Reduced ability of the body's immune system to fight infections, including
   e.  reduced vaccine response.
   f.  Interference with the body's natural hormones.
   g.  Increased cholesterol levels and/or risk of obesity.

43.　　A figure from the European Environmental Agency ("EEA") shows the "[e]ffects of PFAS on human health:"[17]

---

[14] *Id.*
[15] *Id.*
[16] https://www.epa.gov/pfas/our-current-understanding-human-health-and-environmental-risks-pfas
[17] *Emerging chemical risks in Europe - 'PFAS'*, EUROPEAN ENVIRONMENT AGENCY (Dec. 12, 2019, last modified Mar. 9, 2021).



44.     The EEA article further explained that "[p]eople most at risk of adverse health impacts are those exposed to high levels of PFAS, and vulnerable population groups such as children and the elderly."[18]

45.     The danger of PFAS chemicals is well known.  On September 20, 2020, a *New York Times* article titled, "These Everyday Toxins May Be Hurting Pregnant Women and Their Babies", reported on the dangers of PFAS—particularly during gestation and in early childhood development:[19]

46.     Scientists think these widely used industrial chemicals may harm pregnant women and their developing babies by meddling with gene regulators and hormones that control two of

---

[18] *Id.*

[19] Liza Gross, *These Everyday Toxins may be Hurting Pregnant Women and Their Babies*, NEW YORK TIMES (Sept. 23, 2020, updated Oct. 18, 2021) https://www.nytimes.com/2020/09/23/parenting/pregnancy/pfas-toxins-chemicals.html.

the body's most critical functions: metabolism and immunity.[20]

47.     According to the Environmental Protection Agency ("EPA"), limiting exposure to PFAS can help protect individual health. "Because certain PFAS are known to cause risks to human health, the most important steps you and your family can take to protect your health is to understand how to limit your exposure to PFAS by taking [steps to] reduce possible exposure during daily activities."[21]

48.     There is no treatment to remove PFAS from the body. Because PFAS accumulates in body tissues over time, the most obvious way to avoid exposure is for consumers to avoid products which they know contain PFAS.[22]

49.     Defendants are well aware of consumers' desire to avoid potentially harmful chemicals, which is exactly why it has engaged in an aggressive, uniform marketing campaign intended to convince consumers that the Product is free from artificial ingredients like PFAS.

50.     Defendants have engaged in this uniform marketing campaign in an effort to convince reasonable consumers to believe that the Product is superior to other products that are not natural and/or contains artificial ingredients.

51.     Reasonable consumers purchasing the Product would believe, based on Defendants' representations, that the Product does not contain artificial, synthetic, or man-made chemicals that could adversely impact their health.

***Plaintiffs' Independent Testing Confirms the Presence of PFAS Chemicals in the Product***

52.     Plaintiffs sought independent third-party testing to determine whether the Product

---

[20] https://www.nytimes.com/2020/09/23/parenting/pregnancy/pfas-toxins-chemicals.html
[21] https://www.epa.gov/pfas/meaningful-and-achievable-steps-you-can-take-reduce-your-risk (Last Accessed November 18, 2022)
[22] https://www.healthline.com/health-news/how-to-reduce-your-exposure-to-pfas-the-hidden-toxic-forever-chemicals#How-to-limit-PFAS-exposure (Last Accessed November 18, 2022)

contained PFAS chemicals.

53.     Plaintiffs' independent testing was conducted in accordance with accepted industry standards for detecting the presence of PFAS.

54.     Plaintiffs' testing detected material levels of multiple PFAS in the Product, including concerning levels of Perfluorooctanoic acid ("PFOA"), 1H, 1H, 2H, 2H-perfluorooctane sulfonic acid ("6:2FTS"), and Perfluoro-n-decanoic acid ("PFDA").

55.     PFOA is one of the most well-studied types of PFAS and has been indisputably linked to negative health effects.[23]

56.     Human studies have found associations between PFOS exposure and effects on the immune system, the cardiovascular system, human development (e.g., decreased birth weight), and cancer. The most sensitive non-cancer effect and the basis for the updated health advisories for PFOA is suppression of vaccine response in children.[24]

57.     The EPA recently confirmed that the levels at which negative health effects could occur are much lower than previously understood– including near zero in some cases.[25]

58.     In other words, there is no "safe" level of exposure with regard to these chemicals, and even "trace" levels of PFAS can pose a risk to humans.

59.     The EPA recently tightened its lifetime health advisory levels for PFOA exposure in drinking water. For PFOA, the recommendation is 0.004 part per trillion (ppt).[26]

60.     However, Plaintiffs' testing has revealed the Product contains PFOA in amounts more than 100 times the EPA's recommended levels.

---

[23] https://www.atsdr.cdc.gov/pfas/health-effects/overview.html  (Last Accessed November 18, 2022)
[24] https://www.epa.gov/sdwa/questions-and-answers-drinking-water-health-advisories-pfoa-pfos-genx-chemicals-and-pfbs#q3 (Last Accessed November 18, 2022)
[25] *Id*.
[26] *Id*.

61.     Thus, Defendant's Product exposes hundreds of thousands of unsuspecting consumers, to toxic synthetic chemicals at levels far beyond what the EPA deems safe, in direct contradiction to their uniform representations.

**The Presence of PFAS Renders the Product Adulterated, Misbranded, and Illegal to Sell**

62.     Mouthwash is considered a drug under the Federal Food, Drug, and Cosmetic Act ("FDCA") because it is intended for use in the prevention or treatment of disease or to affect the structure or any function of the body, i.e., to reduce plaque and gingivitis. [27]

63.     The U.S. Food and Drug Administration ("FDA") has several safety and effectiveness regulations in place that govern the manufacture and marketing of drug products. Specifically, under the FDCA, drug products are prohibited from being adulterated or misbranded.[28]

64.     A drug product is deemed "adulterated" if it "is composed, in whole or in part, of any poisonous or deleterious substance which may render the contents injurious to health[.]"[29]

65.     A drug product is deemed "misbranded" if "its labeling is false or misleading in any particular."[30]

66.     The mere presence of PFAS renders the Product both adulterated and misbranded under the FDCA. Defendants fail to disclose the presence of PFAS, i.e., an artificial chemical known to cause risks to human health in the Product's labeling, making the Product's marketing "false" and "misleading." A product that is "adulterated" or "misbranded" cannot legally be manufactured, advertised, distributed, or sold.[31]

---

[27] *See* 21 U.S.C. § 321(g)(1).
[28] *See* 21 U.S.C. §§ 351, 352.
[29] *See* 21 U.S.C. § 351(a)(3).
[30] *See* 21 U.S.C. § 352(a)(1).
[31] *See* 21 US.C. § 331(a)

67.     California's Sherman Food, Drug, and Cosmetic Law has expressly adopted the federal labeling requirements as its own. The definition of "adulterated" as defined by Cal. Health & Safety Code § 111265 mirrors the FDA definition, defining an adulterated drug as one that is composed, in whole or in part, of any poisonous or deleterious substance which may render the contents injurious to health."[32]

68.      In fact, under the California law, drugs and cosmetics are required to satisfy all of the labeling requirements of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. §§ 301, *et seq*.), and the federal Fair Packaging and Labeling Act (15 U.S.C. §§ 1451, *et seq*.).[33] It is unlawful in the state of California to distribute drugs if its packaging or labeling does not conform to the provisions of California and/or Federal law.[34] Further, it is unlawful for any person to disseminate any false advertisement of any food, drug, device, or cosmetic. An advertisement is false if it is false or misleading in any particular.[35]It is unlawful for any person to advertise any food, drug, device, or cosmetic that is adulterated or misbranded.[36]

69.     Likewise, the Illinois Food, Drug and Cosmetic Act ("ILFDCA") has expressly adopted the federal labeling requirements as its own, defining "adulterated" drugs as those that "contain any harmful or deleterious substance which may render it injurious to health"[37] and "misbranded" drugs as those whose "labeling is false or misleading in any way."[38]

70.     As alleged herein, Defendant has violated the FDCA; the Magnuson-Moss Warranty Act ("MMWA"); the Sherman Food, Drug, and Cosmetic Law; California's Unfair

---

[32] *See* Cal. Health & Safety Code § 111265.
[33] See Cal. Health & Safety Code § 110371.
[34] Cal. Health & Safety Code § 110385.
[35] Cal. Health & Safety Code § 110390.
[36] Cal. Health & Safety Code § 110398.
[37] *See* 410 ILCS § 620/3.
[38] *Id.*

Competition Law ("UCL"), Consumer Legal Remedies Act ("CLRA"), and False Advertising Law ("FAL"); the Illinois Food, Drug and Cosmetic Act (ILFDCA"); and the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA").

***Defendants' Unlawful Conduct***

71.     At all times relevant to this action, Defendants knew, or at minimum should have known, that its Product contains PFAS.

72.     In fact, Tom's tells consumers it adheres to strict safety protocols in its 'Stewardship Model", which states "our formula standards: natural, safe, and effective":

- Ingredients sourced and derived from nature
- Formulas free of artificial flavors, fragrances, colors, sweeteners and preservatives as well as *animal ingredients.
- Not tested on animals
- Honesty in purpose and source of all ingredients.
- Ingredient processing that supports human and environmental health[39]

73.     To capitalize on increasing consumer demand for "better for you" products which are free from artificial ingredients, including harmful man-made chemicals like PFAS, Defendants have knowingly and willfully deployed a concerted strategy to distinguish its Product from competing options in the highly competitive personal care industry by representing its Product as a "natural" mouthwash without artificial or synthetic ingredients.

74.     Throughout the class period, Defendants have targeted health-conscious consumers by falsely and misleadingly representing its Product as a "natural" mouthwash. Consequently, reasonable consumers believe the Product is free of artificial, man-made chemicals known to harm human health.

75.     Defendants' wellness-focused business strategy is supported by current market

---

[39] https://www.tomsofmaine.com/our-promise/stewardship-model (last visited January 26, 2023).

research. According to a recent survey, 79 percent of respondents said they would be willing to change personal hygiene products if the new product was eco friendlier and 16 percent said they might be willing to change.[40]

76.     At the same time, awareness of, and an inclination toward, safer products is guiding consumer choices.  One survey, for instance, found that "when asked to choose the top three factors they prioritize when deciding between products, the majority of consumers surveyed said they prioritize the health/safety of products (71%) and products free of certain toxic chemicals (70%)."[41]

77.     These findings extend to the packaging of products, with 82% of consumers agreeing that "it is important for brands to balance safety and concern for the environment when designing product packaging."[42]

78.     Additionally, "[t]he majority of shoppers . . . are willing to spend more for a product they know is safer, with 42% willing to spend 5-15% more, 36% willing to spend 16-25% more, and 17% willing to spend 1-5% more."[43]

79.     Therefore, current research demonstrates, and Defendants' marketing strategy supports, that the presence of harmful chemicals in personal care products, and their packaging is material to reasonable consumers.

80.     Defendants' strategy to stay aligned with consumer preferences in order to retain

[40] https://www.storaenso.com/en/newsroom/news/2021/10/consumers-are-ready-for-environmentally-friendly-hygiene-products (last visited January 26, 2023).
[41] Made Safe, "What Shoppers Want: Safe & Healthy Products," https://www.madesafe.org/wpconent/uploads/2017/07/What-Shoppers-Want.pdf (last visited Aug. 12, 2022).
[42] Gray, "New Consumer Packaging Trends Are Changing the Game for Food & Beverage Processors," https://www.gray.com/insights/new-consumer-packaging-trends-are-changing-thegame-for-food-beverage-processors/ (last visited Aug. 12, 2022).
[43] Made Safe, "What Shoppers Want," at 3.

a competitive advantage in the marketplace, which includes representing to sell mouthwashes which do only contain natural ingredients, would inevitably be negatively impacted if it disclosed the presence of PFAS in its Product.

81.     Consumers lack the expertise to ascertain the true ingredients in the Product prior to purchase. Accordingly, reasonable consumers must, and do rely on Defendants to accurately and honestly advertise its Product's ingredients and not contradict those representations by using artificial man-made chemicals in its Product that are known to pose a risk to human health. Such misrepresentations are material to reasonable consumers' purchasing decisions.

82.     Defendants' representations that the Product is a natural mouthwash, including, *inter alia*, the representations described herein, are false because products containing toxic, man-made ingredients like PFAS are not "natural" by definition. Natural claims are also material to consumers, affecting their purchasing decisions.  Marketers recognize the power of "natural" claims on product labels and in advertising.  Indeed, by 2010, "Natural" had become the most popular claim when launching new products in the United States.   Consumers who seek out "natural" products have significant purchasing power and a steadily increasing share of the overall market for consumer goods.

83.     This increased demand is motivated by the belief that natural products are perceived to be higher quality, safer, healthier and better for the environment.  Accordingly, consumers exhibit a preference for natural products, purchase those products and willingly pay a premium for those products.  Illustrating the point, research conducted by the Shelton Group also shows one in three consumers were willing to pay 5% more for a natural product with one in four indicating they would pay up to 10% more.  In other words, a natural product is sufficiently material to a significant number of consumers and individuals are willing to pay more for natural products (if

willing to by unnatural version of the product at all).

84.    Defendants' representations are likely to mislead reasonable consumers, and indeed did mislead Plaintiffs and Class members, regarding the presence of PFAS chemicals in its Product. Accordingly, these acts and practices by Defendants are deceptive.

85.    Consumers reasonably relied on Defendants' false statements and misleading representations, and reasonably expected that Defendants' Product would conform with its representations and, as such, would not contain artificial, man-made PFAS chemicals.

86.    Defendants' false statements, misleading representations and material omissions are intentional, or otherwise entirely careless, and render its Product worthless or less valuable.

87.    If Defendants had disclosed to Plaintiffs and putative Class Members that its Product contained PFAS chemicals and were not natural, Plaintiffs and putative Class Members would not have purchased Defendants' Product or they would have paid less for it.

88.    Plaintiffs and Class Members were among the intended recipients of Defendants' deceptive representations and omissions described herein.

89.    Defendants' representations and omissions, as described herein, are material in that a reasonable person would attach importance to such information and would be induced to act upon such information in making purchase decisions.

90.    The materiality of the representations described herein also establishes causation between Defendants' conduct and the injuries Plaintiffs and the Class Members sustained.

91.    Defendants are aware that the consumers are concerned about the use of PFAS in its products, yet it has continued to market and advertise its Product using "natural" representations in order to profit off of unsuspecting consumers, including Plaintiffs and Class Members.

92.    The presence of PFAS chemicals in Defendants' Product is entirely inconsistent

with its uniform representations.

93.     Defendants' knowingly false and misleading representations have the intended result of convincing reasonable consumers that its Product is without artificial, unnatural, or otherwise synthetic ingredients and therefore do not contain man-made, toxic chemicals. No reasonable consumer would consider Defendants' Product a "natural" mouthwash if they knew that the Product contained harmful, artificial PFAS chemicals.

94.     Defendants' false, misleading, and deceptive representations, as described herein, are likely to continue to deceive and mislead reasonable consumers and the general public. Indeed, they have already deceived and misled Plaintiffs and Class Members.

95.     In making the false, misleading, and deceptive representations, Defendants knew and intended consumers would pay a premium for the Product over comparable products that are made from or contain synthetic or artificial ingredients.

96.     Plaintiffs and Class Members all paid money for the Product, however, they did not obtain the full value of the advertised Product due to Defendants' misrepresentations as detailed herein. Plaintiffs and Class Members purchased, purchased more of, or paid more for, the Product than they would have had they known the truth that the Product contains artificial, man-made, and harmful chemicals. Thus, Plaintiffs and Class Members have suffered injury in fact and lost money or property as a result of Defendants' wrongful conduct.

97.     Defendants' widespread marketing campaign portraying the Product as "natural" as detailed herein, is misleading and deceptive to consumers because the Product contains artificial, man-made, and toxic PFAS chemicals at levels dramatically higher than exposure limits recommended by the EPA.

98.     Accordingly, Plaintiffs bring this action on behalf of the proposed Classes to stop

Defendants' misleading practices.

## PLAINTIFFS' FACTUAL ALLEGATIONS

### *Plaintiff Esquibel*

99.     Plaintiff Abigal Esquibel is a citizen and resident of the state of California.  During the applicable statute of limitations period, Plaintiff purchased and consumed Defendants' Product that contained PFAS.  More specifically, during the class period Plaintiff purchased Defendants' Product numerous times, most recently in January of 2023 at Lassens, a natural food and vitamin chain in California.

100.     Prior to their purchase, Plaintiff Esquibel reviewed the labeling, packaging, and marketing materials of their Product, including those set out herein.  Thus, Plaintiff understood that based on Defendants' claims, including those on the Product's front label, the Product was a "natural" mouthwash and thus was free of artificial, synthetic, and harmful chemicals like PFAS.  Plaintiff reasonably relied on these representations and warranties in deciding to purchase the Product, and these representations were part of the basis of the bargain in that they would not have purchased the Product, or would not have purchased it on the same terms, if they had known the truth.

101.     As a direct result of Defendants' material misrepresentations and omissions, Plaintiff Esquibel suffered and continues to suffer, economic injuries.

102.     Plaintiff Esquibel continues to desire to purchase the Product from Defendants if they can rely on that Product to be safe and free from any artificial ingredients, including those known to pose a risk to human health. However, concerned about the health consequences of PFAS and Defendants' misrepresentations detailed herein, Plaintiff is unable to determine if Defendants' Product is actually natural and free of harmful synthetic chemicals like PFAS in the future.

Plaintiff understands that the composition of the Product may change over time, but as long as Defendants may freely advertise the Product as "natural" despite its material levels of PFAS, then Plaintiff, when presented with false or misleading information when shopping, will be unable to make informed decisions about whether to purchase Defendants' Product and will be unable to evaluate the different prices between Defendants' Product and competitor's products, which *are* in fact natural and free of PFAS.

### *Plaintiff Searle*

103.   Plaintiff Tammy Searle is a citizen and resident of the state of California.  During the applicable statute of limitations period, Plaintiff purchased and consumed Defendants' Product that contained PFAS.  More specifically, during the class period Plaintiff Searle purchased Defendants' Product numerous times, most recently in January of 2022 at a Target store in California.

104.   Prior to their purchase, Plaintiff Searle reviewed the labeling, packaging, and marketing materials of their Product, including those set out herein.  Thus, Plaintiff Searle understood that based on Defendants' claims, including those on the Product's front label, the Product was a "natural" mouthwash and thus was free of artificial, synthetic, and harmful chemicals like PFAS.  Plaintiff Searle reasonably relied on these representations and warranties in deciding to purchase the Product, and these representations were part of the basis of the bargain in that they would not have purchased the Product, or would not have purchased it on the same terms, if they had known the truth.

105.   As a direct result of Defendants' material misrepresentations and omissions, Plaintiff Searle suffered and continues to suffer, economic injuries.

106.   Plaintiff Searle continues to desire to purchase the Product from Defendants if they

can rely on that Product to be safe and free from any artificial ingredients, including those known to pose a risk to human health. However, concerned about the health consequences of PFAS and Defendants' misrepresentations detailed herein, Plaintiff is unable to determine if Defendants' Product is actually natural and free of harmful synthetic chemicals like PFAS in the future. Plaintiff understands that the composition of the Product may change over time, but as long as Defendants may freely advertise the Product as "natural" despite its material levels of PFAS, then Plaintiff Searle, when presented with false or misleading information when shopping, will be unable to make informed decisions about whether to purchase Defendants' Product and will be unable to evaluate the different prices between Defendants' Product and competitor's products, which *are* in fact natural and free of PFAS.

### Plaintiff Wahl

107.    Plaintiff Jeremy Wahl is a citizen and resident of the state of California.  During the applicable statute of limitations period, Plaintiff purchased and consumed Defendants' Product that contained PFAS.  More specifically, during the class period Plaintiff Wahl purchased Defendants' Product numerous times, most recently in November of 2021 at a Target store.

108.    Prior to their purchase, Plaintiff Wahl reviewed the labeling, packaging, and marketing materials of their Product, including those set out herein.  Thus, Plaintiff Wahl understood that based on Defendants' claims, including those on the Product's front label, the Product was a "natural" mouthwash and thus was free of artificial, synthetic, and harmful chemicals like PFAS.  Plaintiff Wahl reasonably relied on these representations and warranties in deciding to purchase the Product, and these representations were part of the basis of the bargain in that they would not have purchased the Product, or would not have purchased it on the same terms, if they had known the truth.

109.    As a direct result of Defendants' material misrepresentations and omissions, Plaintiff Wahl suffered and continues to suffer, economic injuries.

110.    Plaintiff Wahl continues to desire to purchase the Product from Defendants if they can rely on that Product to be safe and free from any artificial ingredients, including those known to pose a risk to human health. However, concerned about the health consequences of PFAS and Defendants' misrepresentations detailed herein, Plaintiff is unable to determine if Defendants' Product is actually natural and free of harmful synthetic chemicals like PFAS in the future. Plaintiff understands that the composition of the Product may change over time, but as long as Defendants may freely advertise the Product as "natural" despite its material levels of PFAS, then Plaintiff Wahl, when presented with false or misleading information when shopping, will be unable to make informed decisions about whether to purchase Defendants' Product and will be unable to evaluate the different prices between Defendants' Product and competitor's products, which *are* in fact natural and free of PFAS.

### Plaintiff Halim

111.    Plaintiff Aimen Halim is a citizen and resident of the state of Illinois.  During the applicable statute of limitations period, Plaintiff Halim purchased and consumed Defendants' Product that contained PFAS.  More specifically, during the class period Plaintiff purchased Defendants' Product numerous times, most recently in January of 2023 at a Whole Foods store in Illinois.

112.    Prior to their purchase, Plaintiff Halim reviewed the labeling, packaging, and marketing materials of their Product, including those set out herein.  Thus, Plaintiff Halim understood that based on Defendants' claims, including those on the Product's front label, the Product was a "natural" mouthwash and thus was free of artificial, synthetic, and harmful

chemicals like PFAS.  Plaintiff Halim reasonably relied on these representations and warranties in deciding to purchase the Product, and these representations were part of the basis of the bargain in that they would not have purchased the Product, or would not have purchased it on the same terms, if they had known the truth.

113.    As a direct result of Defendants' material misrepresentations and omissions, Plaintiff Halim suffered and continues to suffer, economic injuries.

114.    Plaintiff Halim continues to desire to purchase the Product from Defendants if they can rely on that Product to be safe and free from any artificial ingredients, including those known to pose a risk to human health. However, concerned about the health consequences of PFAS and Defendants' misrepresentations detailed herein, Plaintiff is unable to determine if Defendants' Product is actually natural and free of harmful synthetic chemicals like PFAS in the future. Plaintiff understands that the composition of the Product may change over time, but as long as Defendants may freely advertise the Product as "natural" despite its material levels of PFAS, then Plaintiff Halim, when presented with false or misleading information when shopping, will be unable to make informed decisions about whether to purchase Defendants' Product and will be unable to evaluate the different prices between Defendants' Product and competitor's products, which *are* in fact natural and free of PFAS.

### *Plaintiff Salerno*

115.    Plaintiff Nicholas Salerno is a citizen and resident of the state of Illinois.  During the applicable statute of limitations period, Plaintiff Salerno purchased and consumed Defendants' Product that contained PFAS.  More specifically, during the class period Plaintiff purchased Defendants' Product numerous times, most recently in April of 2022 from Amazon.

116.    Prior to their purchase, Plaintiff Salerno reviewed the labeling, packaging, and

marketing materials of their Product, including those set out herein.  Thus, Plaintiff understood that based on Defendants' claims, including those on the Product's front label, the Product was a "natural" mouthwash and thus was free of artificial, synthetic, and harmful chemicals like PFAS. Plaintiff Salerno reasonably relied on these representations and warranties in deciding to purchase the Product, and these representations were part of the basis of the bargain in that they would not have purchased the Product, or would not have purchased it on the same terms, if they had known the truth.

117.   As a direct result of Defendants' material misrepresentations and omissions, Plaintiff Salerno suffered and continues to suffer, economic injuries.

118.   Plaintiff Salerno continues to desire to purchase the Product from Defendants if they can rely on that Product to be safe and free from any artificial ingredients, including those known to pose a risk to human health. However, concerned about the health consequences of PFAS and Defendants' misrepresentations detailed herein, Plaintiff is unable to determine if Defendants' Product is actually natural and free of harmful synthetic chemicals like PFAS in the future. Plaintiff understands that the composition of the Product may change over time, but as long as Defendants may freely advertise the Product as "natural" despite its material levels of PFAS, then Plaintiff Salerno, when presented with false or misleading information when shopping, will be unable to make informed decisions about whether to purchase Defendants' Product and will be unable to evaluate the different prices between Defendants' Product and competitor's products, which *are* in fact natural and free of PFAS.

**INJURY TO THE PUBLIC AT-LARGE AND POTENTIAL FOR FUTURE HARM**

119.   Defendants' wrongful conduct harms the public-at-large.

120.   PFAS chemicals, also known as "forever chemicals," are a category of highly

persistent and toxic man-made chemicals that have been associated with numerous negative health effects for humans.

121.    PFAS chemicals are known to negatively impact the human body, including, but not limited to, decreased fertility, developmental effects or delays in children, increased risk of cancers, liver damage, increased risk of asthma and thyroid disease, adverse impacts on the immune system, interference with hormones and increased cholesterol levels.

122.    Because Defendants' deceptive advertising is ongoing and directed to the public, and because Defendants continue to sell its Product containing PFAS chemicals, the deception poses an ongoing risk to the public.

123.    As such, a public injunction must be provided in order to enjoin Defendants' continued harm of consumers and the public-at-large.

## TOLLING AND ESTOPPEL OF STATUTE OF LIMITATIONS

124.    Defendants had actual knowledge that its Product contained artificial, man-made PFAS chemicals which pose a risk of harm to human health.

125.    Although Defendants were aware of the deception in their advertising, marketing, packaging, and sale of the Product given the inclusion of PFAS chemicals, they took no steps to disclose to Plaintiffs or Class Members that its Product contained PFAS chemicals.

126.    Despite their knowledge, Defendants have fraudulently misrepresented the Product as having qualities and characteristics it does not, while concealing the fact that its Product contains PFAS chemicals.

127.    Defendants made, and continue to make, affirmative false statements and misrepresentations to consumers, and continue to omit the fact that the Product contains PFAS, to promote sales of its Product.

128.    Defendants misrepresented, concealed, and otherwise omitted material facts that

would have been important to Plaintiffs and Class Members in deciding whether to purchase the Product. Defendants' misrepresentations and omissions were knowing, and it intended to, and did, deceive reasonable consumers, including Plaintiffs and Class Members. Accordingly, Plaintiffs and Class Members reasonably relied upon Defendants' misrepresentations and concealment of these material facts and suffered injury as a proximate result of that justifiable reliance.

129.    The PFAS chemicals in the design and/or manufacture of Defendants' Product was not reasonably detectible to Plaintiffs and Class Members.

130.    At all times, Defendants actively and intentionally misrepresented the qualities and characteristics of the Product, while concealing the existence of the PFAS chemicals and failing to inform Plaintiffs or Class Members of the existence of the PFAS chemicals in its Product. Accordingly, Plaintiffs' and Class Members' lack of awareness was not attributable to a lack of diligence on their part.

131.    Defendants' statements, words, and acts were made for the purpose of deceiving the public, and suppressing the truth that the Product contained artificial, man-made PFAS chemicals.

132.    Defendants misrepresented the Product and concealed the PFAS chemicals for the purpose of delaying Plaintiffs and Class Members from filing a complaint on their causes of action.

133.    As a result of Defendants' intentional misrepresentations and active concealment of the PFAS chemicals and/or failure to inform Plaintiffs and Class Members of the PFAS chemicals, any and all applicable statutes of limitations otherwise applicable to the allegations herein have been tolled. Furthermore, Defendants are estopped from relying on any statutes of limitations in light of its intentional misrepresentations and active concealment of the inclusion of artificial, man-made PFAS chemicals in the Product.

134.     Further, the causes of action alleged herein did not occur until Plaintiffs and Class

Members discovered that the Product contained PFAS chemicals. Plaintiffs and Class Members

had no realistic ability to discern that the Product contained PFAS chemicals until they learned of

the existence of the PFAS chemicals through product testing. In either event, Plaintiffs and Class

Members were hampered in their ability to discover their causes of action because of Defendants'

active concealment of the existence and true nature of the Product.

### FEDERAL RULE OF CIVIL POROCEDURE 9(b) ALLEGATIONS

135.     Although Defendants are in the best position to know what content they placed on

their packaging, website(s), and other marketing and advertising during the relevant timeframe,

and the knowledge that it had regarding the PFAS chemicals and its failure to disclose the existence

of PFAS chemicals in the Product to Plaintiffs and consumers, to the extent necessary, Plaintiffs

satisfy the requirements of Rule 9(b) by alleging the following facts with particularity:

136.     **WHO**: Defendants made "natural" representations on the Product's packaging,

online, and its marketing and advertising of the Product.

137.     **WHAT**: Defendants' conduct here was, and continues to be, deceptive and

fraudulent because of its "natural" representations as described herein. Thus, Defendants' conduct

deceived Plaintiffs and Class Members into believing that the Product was manufactured and sold

with the represented qualities. Defendants knew or should have known this information is material

to reasonable consumers, including Plaintiffs and Class Members in making their purchasing

decisions, yet it continued to pervasively market the Product as possessing qualities that it does

not have.

138.     **WHEN**: Defendants made material misrepresentations, false statements and/or

material omissions during the putative Class periods and at the time Plaintiffs and Class Members

purchased the Product, prior to and at the time Plaintiffs and Class Members made claims after

realizing the Product contained artificial, man-made chemicals, and continuously throughout the applicable Class periods.

139.   **WHERE**: Defendants' marketing message was uniform and pervasive, carried through false statements, misrepresentations, and/or omissions on the Product's packaging, as well as on website(s), social media channels, and digital media campaigns used to market and advertise the Product.

140.   **HOW**: Defendants made false statements, misrepresentations and/or material omissions regarding the presence of PFAS chemicals in the Product.

141.   **WHY**: Defendants made the false statements, misrepresentations and/or material omissions detailed herein for the express purpose of inducing Plaintiffs, Class Members, and all reasonable consumers to purchase and/or pay for the Product over other brands that did not make similar natural and otherwise health-focused representations, the effect of which was that Defendant profited by selling the Product to many thousands of consumers.

142.   **INJURY**: Plaintiffs and Class Members purchased, paid a premium, or otherwise paid more for the Product when they otherwise would not have, absent Defendants' misrepresentations, false and misleading statements.

<u>**CLASS ACTION ALLEGATIONS**</u>

143.   Plaintiffs bring this action individually and as the representatives of all those similarly situated pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of the below-defined Classes:

> **National Class**: During the fullest period allowed by law, all persons who purchased the Product within the United States for personal use and not for resale.

> **California Subclass**: During the fullest period allowed by law, all persons who

purchased the Product within the State of California for personal use and not for resale.

**Illinois Subclass**: During the fullest period allowed by law, all persons who purchased the Product within the State of Illinois for personal use and not for resale.

144. Members of the classes described are referred to herein as "Class Members" or members of the "Class."

145. Plaintiffs reserve the right to amend the Class definitions or add a Class or Classes if discovery and/or further investigation reveal that the Class definition(s) should be narrowed, expanded or otherwise modified.

146. The following are excluded from the Class: (1) any Judge presiding over this action and members of his or her family; (2) Defendants, Defendants' subsidiaries, parents, successors, predecessors, and any entity in which Defendants or its parents have a controlling interest (as well as current or former employees, officers, and directors); (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiffs' counsel and Defendants' counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

147. **Numerosity – Federal Rule of Civil Procedure 23(a)(a)**: While Plaintiffs do not know at this time the exact number of proposed Class Members, given the nature of the claims and the volume of sales of the Product nationally, the members of the Class are so numerous that their individual joinder herein is impracticable. Plaintiffs are informed and believe that there are tens of thousands of members in the proposed Class, if not more, and a precise number can be ascertained through discovery. The number of individuals who comprise the Class are so numerous that the disposition of all such person's claims in a class action, rather than in individual actions,

will benefit both the parties and the courts.

148.   **Commonality and Predominance – Federal Rule of Civil Procedure 23(a)(2)
and 23(b)(3)**: Common questions of law and fact exist as to all members of each of the Class and
predominate over questions affecting only individual members of the Class. Such common
questions of law or fact include, but are not limited to, the following:

a.   Whether Defendants misrepresented, omitted, and/or failed to disclose material facts concerning the Product;

b.   Whether Defendants' conduct was unlawful; unfair; fraudulent and/or deceptive;

c.   Whether Defendants breached express warranties to Plaintiffs and Class Members;

d.   Whether Defendants were unjustly enriched as a result of the unlawful conduct alleged herein such that it would be inequitable for Defendants to retain the benefits conferred upon it by Plaintiffs and the proposed Class;

e.   Whether Plaintiffs and the Class have sustained damages with respect to the claims asserted, and if so, the proper measure of their damages.

Defendants engaged in a common course of conduct giving rise to the legal rights Plaintiffs
seek to enforce on behalf of themselves and the other Members of the proposed Class. Similar or
identical statutory and common law violations, business practices, and injuries are involved.
Individual questions, if any, pale in comparison, in both quality and quantity, to the numerous
common questions that dominate this action.

149.   **Typicality – Federal Rule of Civil Procedure 23(a)(3)**. Plaintiffs' claims are
typical of the claims of the other Members of the Class because, among other things, all Members
of the Class were comparably injured through Defendants' uniform misconduct described herein.
Further, there are no defenses available to Defendants that are unique to Plaintiffs or to any
particular Members of the Class.

150.     **Adequacy of Representation – Federal Rule of Civil Procedure 23(a)(4).**
Plaintiffs are adequate Class representatives because their interests do not conflict with the
interests of the other Members of the Class they seek to represent; they have retained counsel
competent and experienced in complex class action litigation; and they will prosecute this action
vigorously.  The interests of the Class will be fairly and adequately protected by Plaintiffs and the
undersigned counsel.

151.     **Insufficiency of Separate Actions – Federal Rule of Civil Procedure 23(b)(1).**
Absent a representative class action, Members of the Class would continue to suffer the harm
described herein, for which they would have no remedy.  Even if separate actions could be brought
by individual consumers, the resulting multiplicity of lawsuits would cause undue burden and
expense for both the Court and the litigants, as well as create a risk of inconsistent rulings and
adjudications that might be dispositive of the interests of similarly situated purchasers,
substantially impeding their ability to protect their interests, while establishing incompatible
standards of conduct for Defendant.  The proposed Classes thus satisfy the requirements of Fed.
R. Civ. P. 23(b)(1).

152.     **Superiority – Federal Rule of Civil Procedure 23(b)(3).** A class action is superior
to any other available means for the fair and efficient adjudication of this controversy, and no
unusual difficulties are likely to be encountered in the management of this class action. The
damages or other financial detriment suffered by Plaintiffs and the other Members of the Class are
relatively small compared to the burden and expense that would be required to individually litigate
their claims against Defendants, so it would be impracticable for Members of the Class to
individually seek redress for Defendants' wrongful conduct.  Even if Members of the Class could
afford individual litigation, the court system could not.  Individualized litigation would create a

potential for inconsistent or contradictory judgments and increase the delay and expense to all parties and the court system.  By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## CAUSES OF ACTION

### COUNT I
**For Violation Of California's False Advertising Law,**
**Business & Professions Code § 17500 ("FAL")**
**(On behalf of the California Plaintiffs and the California Subclass)**

153.    Plaintiffs Esquibel, Searle and Wahl re-allege and incorporate by reference all preceding factual allegations as though set forth fully herein.

154.    Plaintiffs bring this cause of action on behalf of themselves and the California Subclass Members against Defendants.

155.    The FAL provides that "[i]t is unlawful for any person, firm, corporation or association, or any employee thereof with intent directly or indirectly to dispose of real or personal property or to perform services" to disseminate any statement "which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." Cal. Bus. & Prof. Code § 17500.

156.    It is also unlawful under the FAL to disseminate statements concerning property or services that are "untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." *Id*.

157.    Defendants' improper consumer-oriented conduct—including labeling and advertising the Product as "natural"—is misleading in a material way in that it, *inter alia*, induced Plaintiffs and the California Subclass Members to purchase and pay a premium for Defendants' Product and to use the Product when they otherwise would not have. Defendants made the untrue

and/or misleading statements, omissions, and representations willfully, wantonly, and with reckless disregard for the truth.

158.    At the time of its misrepresentations, Defendants were either aware that the Product contained PFAS and was therefore not "natural," or were aware that they lacked the information and/or knowledge required to truthfully represent that the Product would not expose Plaintiffs and consumers to the risk of PFAS exposure.  Defendants concealed, omitted and failed to disclose this information to Plaintiffs and Class Members.

159.    Defendants' descriptions of the Product were false, misleading, and likely to deceive Plaintiffs and other reasonable consumers.

160.    Plaintiff and the California Subclass Members have been injured inasmuch as they paid a premium for a Product that was—contrary to Defendants' representations— not natural and did contain measurable levels of the man-made chemical PFAS. Accordingly, Plaintiffs and the California Subclass Members received less than what they bargained and/or paid for. Had Defendant disclosed the true nature of the Products, and the fact that it contains a chemical that is a known carcinogen associated with serious health consequences, Plaintiffs and California Subclass Members would either not purchased the Products or would have paid substantially less for them.

161.    Defendants' business practices as alleged herein constitute deceptive, untrue, and misleading advertising pursuant to the FAL because Defendants have advertised the Product in a manner that is untrue and misleading, which Defendants knew or reasonably should have known, and omitted material information from its advertising.

162.    Defendants profited from its sale of the falsely and deceptively advertised Product to unsuspecting consumers.

163.   Plaintiffs, individually and on behalf of all similarly situated California consumers, seek individual, representative, and public injunctive relief and any other necessary orders or judgments that will prevent Defendant from continuing with its false and deceptive advertisements and omissions; restitution that will restore the full amount of their money or property. The restitution sought is in alternative to any monetary damages. Injunctive relief should include an order requiring Defendant to provide corrective notices to customers regarding Defendant's mislabeling, including but not limited to, the Product is not "natural" and Defendant is not a "#1 Natural Mouthwash Brand.

164.   As a result, Plaintiffs, California Subclass Members, and the general public are entitled to injunctive and equitable relief, restitution, and an order for the disgorgement of the funds by which Defendants were unjustly enriched. Plaintiffs seek such equitable relief, in the alternatively, should their legal remedies prove unavailable.

165.   Legal remedies are not adequate to remedy the injury alleged herein.  First, it is unknown if monetary damages will be awarded by the Court.  Second, the injuries to Plaintiffs and the Class stems from Defendant's failure to provide a "natural" mouthwash without the inclusion of harmful PFAS chemicals.  Absent such remedies, customers will continue to purchase the mislabeled Product without receiving an adequate legal remedy. Accordingly, the Court should provide equitable remedies to prevent future harm to Plaintiff and other members of the Class.

166.   Plaintiff brings this action as private attorneys general and to vindicate and enforce an important right affecting the public interest. Plaintiff and the Class are therefore entitled to an award of attorneys' fees under Code of Civil Proc. § 1021.5 for bringing this action.

## COUNT II
### For Violation Of California's Unfair Competition Law,
### Business & Professions Code § 17200 et seq. ("UCL")
### (On behalf of the California Plaintiffs and the California Subclass)

167.   Plaintiffs re-allege and incorporate by reference all preceding factual allegations as though set forth fully herein.

168.   Plaintiffs brings this cause of action on behalf of themselves and California Subclass Members against Defendants.

169.   The UCL prohibits any "unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200.

170.   The acts, omissions, misrepresentations, practices, and non-disclosures of Defendants as alleged herein constitute business acts and practices.

171.   The acts alleged herein are "unlawful" under the UCL in that they violate at least the following laws:

   a.   The False Advertising Law, Cal. Bus. & Prof. Code §§ 17500 *et seq*.;
   b.   The Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750 *et seq*.;
   c.   The Federal Food, Drug, and Cosmetic Act, 21 U.S.C. §§ *301 et seq*.; and
   d.   The California Sherman Food, Drug, and Cosmetic Law, Cal. Health & Safety Code §§ 110100 *et seq*.

172.   Defendants' conduct with respect to the labeling, advertising, and sale of the Product was "unfair" because Defendants' conduct was immoral, unethical, unscrupulous, or substantially injurious to consumers and the utility of their conduct, if any, does not outweigh the gravity of the harm to their victims.

173.   Defendants' conduct with respect to the labeling, advertising, and sale of the Product was and is also unfair because it violates public policy as declared by specific constitutional, statutory or regulatory provisions, including but not limited to the applicable sections of: the Consumers Legal Remedies Act, the False Advertising Law, the Federal Food, Drug, and Cosmetic Act, and the California Sherman Food, Drug, and Cosmetic Law.

174. Defendant's conduct was unfair in that in violated established public policies of the State of California, and injured consumers with no corresponding benefit to consumers or competition. Indeed, there can be no benefit to consumers or competition in Defendant's mislabeled Product. Consumers could not avoid the injury alleged herein because Defendant failed to adequately disclose the ingredients within the Product. There were reasonably available alternatives to further Defendant's legitimate business interests, other than the conduct described herein. There were reasonably available alternatives to further Defendant's legitimate business interests, other than the conduct described herein.

175. A statement or practice is "fraudulent" under the UCL if it is likely to mislead or deceive the public, applying an objective reasonable consumer test. As set forth herein, Defendants' claims relating the representations and omissions stated on the Products' labeling and marketing statements mislead reasonable consumers inasmuch as they misrepresent that the Product is "natural" and therefore free of PFAS

176. Defendants profited from its sale of the falsely, deceptively, and unlawfully advertised Product to unsuspecting consumers.

177. Plaintiffs and California Subclass Members are likely to continue to be damaged by Defendants' deceptive trade practices, because Defendants continue to disseminate misleading information on the Product's packaging. Additionally, Plaintiffs have purchased the Product, and would be willing to purchase the Product again, if the risk of PFAS exposure was eliminated. Thus, injunctive relief enjoining Defendants' deceptive practices is proper.

178. Defendants' conduct caused and continues to cause substantial injury to Plaintiffs and the other California Subclass Members. Plaintiffs have suffered injury in fact as a result of Defendants' unlawful conduct, including economic injury.

179.    Pursuant to Cal. Bus. & Prof. Code § 17203, Plaintiff and members of the Class seek a court order enjoining Defendant from such future misconduct, and any other such orders that may be necessary to rectify the unlawful business practices of Defendant. This includes an order requiring Defendant to provide corrective notices to customers regarding Defendant's mislabeling, including but not limited to, the Product is not "natural" and Defendant is not a "#1 Natural Mouthwash Brand".

180.    In the alternative to any damages, Plaintiff and the Class seek restitution pursuant to Cal. Bus. & Prof. Code § 17203 of all amounts collected by Defendant due to the selling of the Product to Plaintiff and the Class during the four years preceding the filing of this Complaint.

181.    Legal remedies are not adequate to remedy the injury alleged herein.  First, it is unknown if monetary damages will be awarded by the Court.  Second, the injuries to Plaintiffs and the Class stems from Defendant's failure to provide a "natural" mouthwash without the inclusion of harmful PFAS chemicals.  Absent such remedies, customers will continue to purchase the mislabeled Product without receiving an adequate legal remedy. Accordingly, the Court should provide equitable remedies to prevent future harm to Plaintiff and other members of the Class.

## COUNT III
### Violation Of California's Consumer Legal Remedies Act,
### Civil Code § 1770 ("CLRA")
### (On behalf of the California Plaintiffs and the California Subclass)

182.    Plaintiffs re-allege and incorporate by reference all preceding factual allegations as though set forth fully herein.

183.    Plaintiffs bring this cause of action on behalf of themselves and California Subclass Members against Defendants.

184.    The CLRA prohibits deceptive practices in connection with the conduct of a business that provides goods, property, or services primarily for personal, family, or household

purposes.

185.    Defendants' false and misleading labeling and other policies, acts, and practices were designed to, and did, induce the purchase and use of the Product for personal, family, or household purposes by Plaintiffs and Class Members, and violated and continue to violate the following sections of the CLRA:

      a.    § 1770(a)(5): representing that goods have characteristics, uses, or benefits which they do not have;

      b.    § 1770(a)(7): representing that goods are of a particular standard, quality, or grade if they are of another;

      c.    § 1770(a)(9): advertising goods with intent not to sell them as advertised; and

      d.    § 1770(a)(16): representing the subject of a transaction has been supplied in accordance with a previous representation when it has not.

186.    Defendants profited from the sale of the falsely, deceptively, and unlawfully advertised Product to unsuspecting consumers.

187.    Defendants' wrongful business practices constituted, and constitute, a continuing course of conduct in violation of the CLRA.

188.    Pursuant to the provisions of Cal. Civ. Code § 1782(a), Plaintiffs provided written notice to Defendants on about January 26, 2023 via certified mail through the United States Postal Service demanding corrective action pursuant to the CLRA. If Defendants do not thereafter correct their business practices, Plaintiffs will amend (or seek leave to amend) the complaint to add claims for monetary relief, including restitution and actual damages under the Consumers Legal Remedies Act.

189.    Venue is proper pursuant to Civil Code § 1780(d) because transactions giving rise

to this action occurred within this District. A Declaration establishing that this Court is the proper venue for this action is attached as Exhibit A.

190.     Pursuant to California Civil Code § 1780, Plaintiffs seek injunctive relief, reasonable attorney fees and costs, and any other relief that the Court deems proper.

## COUNT IV
### Violation Of the Illinois Consumer Fraud and Deceptive Business Practices Act
### 815 ILCS § 505/1 *et seq*. ("ICFA")
### (On Behalf of the Illinois Plaintiffs and the Illinois Subclass)

191.     Plaintiffs re-allege and incorporate by reference all preceding factual allegations as though set forth fully herein.

192.     Plaintiffs bring this cause of action on behalf of themselves and Illinois Subclass Members against Defendants.

193.     Plaintiffs and other Class Members are persons,[44] constituting consumers having purchased the product for personal, family or household use under the ICFA.[45]

194.     Defendants are persons under the ICFA,[46] and at all times relevant hereto, Defendants were engaged in trade or commerce as defined by the ICFA.[47]

195.     The ICFA prohibits engaging in any "unfair or deceptive acts or practices … in the conduct of any trade or commerce…."[48], and prohibits any deceptive, unlawful, unfair, or fraudulent business acts or practices including using deception, fraud, false pretenses, false promises, false advertising, misrepresentation, or the concealment, suppression, or omission of any material fact, or the use or employment of any practice described in 815 ILCS § 505/2.[49]

---

[44] *See* 815 ILCS § 505/1(c).
[45] *See* 815 ILCS § 505/1(e)
[46] *Id.*
[47] *See* 815 ILCS § 505/1(f).
[48] 815 ILCS § 505/2
[49] *Id.*

196.     Plaintiffs and the other Illinois Subclass Members reasonably relied upon Defendants' representations that the Product was "natural" and therefore free from artificial or synthetic ingredients. Due to Defendants' omission of the presence of PFAS in the Product, Plaintiffs read and relied on Defendants' labeling to conclude that the Product was not contaminated with any unnatural or synthetic substances, including PFAS.

197.     Defendants' conduct, as described herein, took place within the State of Illinois and constitutes unfair or deceptive acts or practices in the course of trade and commerce, in violation of 815 ICFA 505/1, *et seq.*

198.     Defendants violated the ICFA by representing that the Product has characteristics or benefits that it does not have, i.e., that the product is "natural" when in fact it contains artificial, synthetic, man-made chemicals known to pose a hazard to human health.[50, 51]

199.     Defendants advertised the Product with intent not to sell it as advertised, in violation of 815 ILCS § 505/2 and 815 ILCS § 510/2(9).

200.     Defendants engaged in fraudulent and/or deceptive conduct which creates a likelihood of confusion or of misunderstanding in violation of 815 ILCS § 505/2 and 815 ILCS § 510/2(3).

201.     Prior to placing the Product into the stream of commerce and into the hands of consumers to use on their bodies, Defendants knew or should have known that the Product contained PFAS, but Defendants not only failed to properly test and quality-check its Product, but further misrepresented, omitted, and concealed this fact to consumers, including Plaintiffs and Class members, by not including PFAS or the risk of PFAS contamination on the Product's labels or otherwise warning of its presence.

---

[50] *Id*.
[51] 815 ILCS § 510/2(7).

202.    Defendants intended that Plaintiffs and each of the other Illinois Subclass Members would reasonably rely upon the misrepresentations, misleading characterizations, warranties and material omissions concerning the true nature of the Product.

203.    Given Defendants' position in the oral health market as an industry leader, Plaintiffs and reasonable consumers, trusted and relied on Defendants' representations and omissions regarding the presence of PFAS in the Product.

204.    Defendants' misrepresentations, concealment, omissions and other deceptive conduct were likely to deceive and cause misunderstanding and/or in fact caused Plaintiffs and each of the other Illinois Subclass Members to be deceived about the true nature of the Product.

205.    Plaintiffs and Class Members have been damaged as a proximate result of Defendants' violations of the ICFA and have suffered damages as a direct and proximate result of purchasing the Product.

206.    As a direct and proximate result of Defendants' violations of the ICFA, as set forth above, Plaintiffs and the Illinois Subclass Members have suffered ascertainable losses of money caused by Defendants' misrepresentations and material omissions regarding the presence of PFAS in the Product. Had they been aware of the true nature of the Product, Plaintiffs and Class Members either would have paid less for the Product or would not have purchased them at all.

207.    Based on Defendants' unfair and/or deceptive acts or practices, Plaintiffs and the Illinois Subclass Members are therefore entitled to relief, including restitution, actual damages, treble damages, punitive damages, costs and attorney's fees, under 815 ILCS 505/10a.

## COUNT V
### Fraud
**(Plaintiffs On Behalf of the National Class)**

208.    Plaintiffs repeat and re-allege the allegations above as if set forth herein.

209.    At the time Plaintiffs and Class Members purchased the Product, Defendants did not disclose, but instead concealed and misrepresented, the Product as safe.

210.    Defendants affirmatively misrepresented the nature and quality of the Product, giving the Product the appearance of being natural and safe for human consumption.

211.    Defendants also knew that its omissions and misrepresentations regarding the Product were material, and that a reasonable consumer would rely upon Defendants' representations (and corresponding omissions) in making purchasing decisions.

212.    Defendants possessed superior knowledge as Plaintiffs and Class Members did not know—nor could they have known through reasonable diligence—about the true nature of the Product.

213.    Plaintiffs and Class Members were reasonable in relying on Defendants' misrepresentations (and corresponding omissions) in making their purchasing decisions.

214.    Plaintiffs and Class Members had a right to reply upon Defendants' representations (and corresponding omissions) as Defendants maintained exclusive control over knowledge of the true quality of the Product.

215.    Plaintiffs and Class Members sustained damages as a result of their reliance on Defendants' omissions and misrepresentations, thus causing Plaintiffs and Class Members to sustain actual losses and damages in a sum to be determined at trial.

216.    Additionally, as a result of Defendants' willful and malicious conduct, punitive damages are warranted.

### COUNT VII
### Constructive Fraud
### (Plaintiffs On Behalf of the National Class)

217.    Plaintiffs repeat and re-allege the allegations above as if set forth herein.

218.    At the time Plaintiffs and Class Members purchased the Product, Defendants falsely claimed the Product was natural and did not disclose that the Product contains dangerous levels of PFAS.

219.    Defendants affirmatively misrepresented the nature of the Product, giving the Product the appearance of being natural, healthy, and otherwise safe for human consumption as detailed herein.

220.    Defendants also knew that its omissions and misrepresentations regarding the Product were material, and that a reasonable consumer would rely upon its representations (and corresponding omissions) in making purchasing decisions.

221.    Defendants had an obligation not to omit or misrepresent the Product because in addition to the fact that the Product pertained to matters of safety: (a) it was in the sole possession of such information; (b) it made partial representations regarding the quality of the Product; (c) Plaintiffs and the Class Members relied upon Defendants to make full disclosures based upon the relationship between Plaintiffs and Class Members, who relied on Defendants' representations and omissions, and were reasonable in doing so, with the full knowledge of Defendants that it did and would have been reasonable in doing so.

222.    Plaintiffs and Class Members did not know—nor could they have known through reasonable diligence—about the true nature and quality of the Product.

223.    Plaintiffs and Class Members were reasonable in relying on Defendants' misrepresentations (and corresponding omissions) in making their purchasing decisions.

224.    152. Plaintiffs and Class Members had a right to rely upon Defendants' representations (and corresponding omissions) as, in addition to the fact that the issue pertained to safety, Defendants maintained exclusive control over knowledge of the true quality of the Product,

and what information was available regarding the Product.

225.    Defendants breached their duty to Plaintiffs and Class Members to make full disclosures of the safety of their Product.

226.    Plaintiffs and Class Members sustained actual losses and damages as a result of their reliance on Defendants' omissions and misrepresentations, and Defendants' breach of its duty, in a sum to be determined at trial.

<u>**COUNT VIII**</u>
**Unjust Enrichment**
**(Plaintiffs In the Alternative and On Behalf of the National Class)**

227.    Plaintiffs repeat and re-allege the allegations above as if set forth herein.

228.    At all relevant times, Defendants were responsible for designing, constructing, testing, manufacturing, inspecting, distributing, labeling, marketing, advertising, and/or selling the Product and its packaging. At all relevant times, it was reasonably foreseeable by Defendants that the use of the Product in its intended manner involved substantial risk of injury and was unreasonably dangerous to Plaintiffs and the Class as the ultimate users of the Product.

229.    At all relevant times, Defendants knew or had reason to know of the risk of injury and the resultant harm that the Product posed to Plaintiffs and Class Members, as the Defect existed at the time of its design, construction, manufacture, inspection, distribution, labeling, marketing, advertising, and/or sale, as described herein.

230.    Defendants as the designer, manufacturer, tester, distributor, marketer, advertiser, and/or seller of the Product, had a duty to warn Plaintiffs and the Class of all dangers associated with consumption of the Product.

231.    At minimum, the duty arose for Defendants to warn consumers that use of the Product could result in injury and was unreasonably dangerous.

232.     Defendants have been unjustly enriched in retaining the revenues derived from the purchases of the Product by Plaintiffs and the other members of the Class.  Retention of those monies under these circumstances is unjust and inequitable because Defendants' representations regarding the quality or value of the Product were misleading to consumers, which caused injuries to Plaintiffs and the other members of the Class, because they would have not purchased the Product had they known the truth or would only have purchased the Product for a lower price.

233.     Because Defendants' retention of the non-gratuitous benefits conferred on it by Plaintiffs and the other members of the Class is unjust and inequitable, Defendants must pay restitution to Plaintiffs and the other members of the Class for its unjust enrichment, as ordered by the Court.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of all other similarly situated members of the Class, pray for relief and judgment, including entry of an order, as follows:

(a) Declaring that this action is properly maintained as a class action, certifying the proposed Class, appointing Plaintiffs as Class Representatives and appointing Plaintiffs' counsel as Class Counsel;

(b) Directing that Defendants bear the costs of any notice sent to the Class;

(c) Ordering Defendants to pay restitution to Plaintiffs and the Class;

(d) A jury trial and damages according to proof;

(e) Awarding actual damages to Plaintiffs and the Class;

(f) Awarding Plaintiffs and members of the Class statutory damages, as provided by the applicable state consumer protection statutes invoked above;

(g) Awarding attorneys' fees and litigation costs to Plaintiffs and members of the Class;

(h) Civil penalties, prejudgment interest and punitive damages as permitted by law; and

(i) Ordering such other and further relief as the Court deems just and proper.

## <u>JURY TRIAL DEMAND</u>

Plaintiffs hereby demand a jury trial of the claims asserted in this Class Action Complaint.

Dated: January 27, 2023

Respectfully submitted,

**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC**

*/s/ Russell Busch*

Russell Busch (6329500)
405 E 50th Street
New York, NY 10022
Tel: (630) 796-0903
Fax: (865) 522-0049
rbusch@milberg.com

Nick Suciu III*
**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC**
6905 Telegraph Road, Suite 115
Bloomfield Hills, MI 48301
Tel: (313) 303-3472
nsuciu@milberg.com

Gary Klinger*
**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC**
221 West Monroe Street, Suite 2100
Chicago, IL 60606
Tel: (866) 252-0878
gklinger@milberg.com

Erin Ruben*
**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN PLLC**
900 W. Morgan Street
Raleigh, NC 27603
T: 919-600-5000
eruben@milberg.com

J. Hunter Bryson*
**MILBERG COLEMAN BRYSON**
**PHILLIPS GROSSMAN, PLLC**
405 E 50th Street
New York, NY 10022
Tel: (630) 796-0903
hbryson@milberg.com

* *Pro Hac Vice* application forthcoming

*Attorneys for Plaintiffs and the Proposed*

## <u>CLRA VENUE DECLARATION OF RUSSELL BUSCH</u>

I, Russell Busch, declare as follows:

1.     I am an attorney duly licensed and entitled to practice law in the state of New York. I am an attorney of the law firm Milberg Coleman Bryson Phillips Grossman PLLC, attorneys for Plaintiffs Abigail Esquibel, Tammy Searle, Jeremy Wahl, and the other plaintiffs in above-captioned action. I have personal knowledge of the facts stated herein, and if called to do so, could and would competently testify thereto.

2.     Based on information from Defendant's website, Defendant Colgate Palmolive Co. resides, has its principal place of business, is registered to do business and/or is in-fact doing business at 300 Park Ave, New York, New York 10022, located within the County of New York.

3.     Accordingly, pursuant to California Code of Civil Procedure, section 1780, the Southern District of New York is the proper venue for Plaintiffs' California Consumer Legal Remedies Act claims.

I declare under penalty of perjury under the laws of the State of New York that the foregoing is true and correct.

Executed on January 27, 2023, in New York, New York.


*/s/ Russell Busch*
Russell Busch